
FILED

Jul 10 2024, 10:03 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



I N   T H E

# Court of Appeals of Indiana

In re the Guardianship of
Martin Sebastian,

*Appellant-Petitioner*

---

July 10, 2024

Court of Appeals Case No.
23A-GU-3059

Appeal from the Jackson Circuit Court

The Honorable Richard W. Poynter, Judge

Trial Court Cause No.
36C01-2303-GU-5

---

**Opinion by Judge Vaidik**
Judges Weissmann and Foley concur.

**Vaidik, Judge.**

# Case Summary

[1] Martin Sebastian was born in Guatemala and lived with his mother. Martin's father, who died in 2021, never recognized or acknowledged him as his child and did not support him. In 2022, at age seventeen, Martin came to the United States and moved in with his half-brother in Indiana. His half-brother became his guardian. Martin later asked the trial court to make three findings necessary for him to seek classification as a Special Immigrant Juvenile (SIJ) under 8 U.S.C. § 1101(a)(27)(J) before the United States Citizenship and Immigration Services (USCIS), which is the federal agency that oversees lawful immigration to the United States. SIJ status would allow Martin to become a lawful permanent resident. The trial court made two of the findings but did not make the third, that is, that reunification with one or both of Martin's parents is not viable due to abuse, neglect, abandonment, or similar basis under Indiana law. The court found that because Martin's father died a year before he left Guatemala for the United States, his father did not abandon him.

[2] Martin appeals, arguing the trial court should have found that reunification with Father is not viable due to abandonment. We agree and hold that when a parent, having abandoned a child, dies in that state of abandonment, the child's inability to reunify with that parent is still due to abandonment for purposes of the SIJ statute. We therefore reverse and remand.

## Facts and Procedural History

Martin was born in Guatemala in March 2005. His mother, Marta Sebastian Mateo ("Mother"), has seven children. Her youngest two children are Martin and his younger brother, who share the same father, Efrain Lorenzo Diego ("Father"). One of Mother's older children is Gaspar Juan Sebastian, who came to the United States in 2017, settling in Seymour, Indiana.

Martin and his younger brother lived with Mother in Guatemala. Father had another family in Guatemala and lived with them. Father didn't acknowledge or accept Martin and his younger brother as his children and didn't support them, emotionally or financially. Mother worked "from sunrise until sunset" washing clothes and cleaning houses, but she still didn't have enough money to support Martin and his younger brother. Ex. 1. There were "many times" when they went hungry, and some days they ate only once. Tr. p. 25. Mother "often beg[ged] [Father] for money to provide food and clothing" for Martin and his younger brother, but only on "rare occasions" did Father give her money. Ex. 1. When he did, it was for "small amounts of money (100 quetzales or $13 USD)." *Id.* Martin stopped going to school when he was eight years old because Mother couldn't afford to send him.

Although Father rarely came around, Martin was "afraid" of him. Tr. p. 22. Father would "hit [Martin] with his belt" and "punch [him] with his hand," leaving bruises. *Id.* at 23. Martin also witnessed Father "hit" Mother with a "stick" and "whip." *Id.* Father drank a lot, and Martin would hide when he was

drinking so he didn't get "beat." *Id.* at 24. According to Mother, Father threatened to kill her, Martin, and his younger brother if they ever "acted out of line." Ex. 1.

[6] Father died in August 2021. Before his death, Father had not visited Martin for several years and had only seen him at a market.

[7] Sometime in 2022, Martin told Mother that he was going on a trip. In reality, he paid a "coyote"—a person paid to take people across the border—around $6,500 USD to take him across the United States-Mexico border. Tr. p. 34. When Martin crossed into the United States, he contacted Gaspar, and Martin moved in with him in Seymour.

[8] In March 2023, Gaspar, then twenty-seven, filed a petition to be appointed guardian of Martin, then seventeen, in Jackson Circuit Court. The trial court granted the petition and ordered the guardianship to continue until Martin turns twenty-two.

[9] In July, Martin filed a motion asking the trial court to make certain findings necessary for him to seek classification as an SIJ under 8 U.S.C. § 1101(a)(27)(J) before USCIS, which would allow him to become a lawful permanent resident. *See In re Estate of Nina L. ex rel. Howerton*, 41 N.E.3d 930, 935 (Ill. App. Ct. 2015) ("If the application is granted, the juvenile may become a lawful permanent resident who, after five years, is eligible to become a United States citizen."); *see also* 8 U.S.C. §§ 1204, 1255.

The three findings a state court must make before a juvenile can seek SIJ status before USCIS are:

> (1) The juvenile has been declared dependent on a juvenile court located in the United States or placed in the custody of a State agency or individual by a juvenile court located in the United States;

> (2) "[R]eunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law"; and

> (3) It is not "in the alien's best interest to be returned to the alien's . . . previous country of nationality or country of last habitual residence[.]"

8 U.S.C. § 1101(a)(27)(J)(i), (ii); 8 C.F.R. § 204.11(c); *see also* 6 U.S. Citizenship & Immigration Servs. Policy Manual, Part J, Chapter 2, https://www.uscis.gov/policy-manual/volume-6-part-j-chapter-2.

A hearing was held in August 2023. No one opposed Martin's motion. Mother submitted an affidavit, which sets forth the facts detailed above and claims that she cannot financially support Martin because she cannot support herself. Ex. 1. Mother also said she would be concerned for Martin's safety if he were returned to Guatemala. Gaspar testified that he was supporting Martin and that he would be "afraid" for Martin to go back to Guatemala because of the crime and the fact that Martin would have no support there. Tr. p. 16. Finally, Martin, then eighteen, testified as detailed above and that he was starting his sophomore

year at Seymour High School, was learning English, and didn't want to go back to Guatemala because it isn't safe and there are no opportunities for him there.

[12] After Martin's attorney questioned him, the judge asked him several questions about the coyote he used to take him across the border, how much the coyote cost, who loaned him the money to pay for the coyote, what his repayment terms are, and whether other people traveled with him across the border. Martin's attorney told the judge that how Martin crossed the border wasn't relevant; rather, the trial court was only charged with making the above three findings. The judge responded:

> What I'm trying to establish is the child trafficking that this Court and every other court in this country is participating in. That's why I asked the questions I asked. I realize that many judges don't care and many judges don't want to know the child trafficking that we are participating in. **But your client like every other client I have dealt with since the Court of Appeals got us into this business has been either paid through a family member or borrowed money to get to the border.** Thousands and thousands of dollars are being profited from every child that is trafficked to our border. **So I want these orders to reflect this so the United States government can take great pride in the trafficking of children.** So I don't begrudge anybody who wants a better life, I am quite sure, I have been to the third world, I am quite sure life in Guatemala is tough, okay . . . . I just have a problem with trafficking in children, that is my concern. So I don't begrudge this young man or any child wanting a better life because obviously we are lucky to live and have been born in this country. So, that's my point counsel. . . . **[A]nd while I realize that you are technically correct that the trafficking of money with the children is not technically part of this[,] since the**

**Court of Appeal[s] got us into this I want them to [be] well aware of what we are participating in.**

*Id.* at 36-37 (emphases added).

[13]    Three months later, in November, the judge issued an order in which it made the first and third required findings, specifically, that it had appointed Gaspar as guardian of Martin until the age of twenty-two and that it is not in Martin's best interests to be returned to Guatemala. Appellant's App. Vol. II p. 6. The judge did not make the second required finding that reunification with one or both of Martin's parents is not viable due to abuse, neglect, abandonment, or similar basis under Indiana law. The judge, however, made the following finding:

> 14. The Court cannot find the child was "abandoned" at the time the child decided to leave Guatemala. The father died on August 1, 2021, and death is not a voluntary act unless caused by suicide and there is no evidence before this Court that the father committed suicide. The mother certainly did not abandon the child as the child was residing with his mother at the time the child decided to leave Guatemala.

*Id.* at 6-7. At the end of its order, the judge said:

> This Court is aware that the findings this Court makes will be used in a subsequent immigration hearing. This Court has conducted several of these hearings where the sworn testimony has been that the child's relatives here in the U.S. are arranging with the child's parent(s) in countries like Guatemala, Honduras, and El Salvador to pay "couriers" to bring the underage children to the border of the U.S. This Court can only imagine how many children have been and currently are being abused by "couriers" who are profiting in the trafficking of children because of a U.S.

> Immigration law that gives an incentive and hope to a parent(s), a child and other relatives (who want a better life for the child or children) in the migration of the child or children to the border of the U.S.

*Id.* at 8.

Martin now appeals.

## Discussion and Decision

Martin contends the trial court erred in failing to find that reunification with one or both of his parents is not viable due to abuse, neglect, abandonment, or similar basis under Indiana law, which is required for him to seek SIJ classification before USCIS.

Congress first created the SIJ classification in 1990, though it has been amended over the years. *See* 6 U.S. Citizenship & Immigration Servs. Policy Manual, Part J, Chapter 1, https://www.uscis.gov/policy-manual/volume-6-part-j-chapter-1. Since then, there have been five Indiana appellate decisions addressing SIJ status. *See In re Guardianship of Luis*, 114 N.E.3d 855 (Ind. Ct. App. 2018) (*Luis I*); *In re Paternity of Mendoza Bonilla*, 127 N.E.3d 1181 (Ind. Ct. App. 2019); *In re Guardianship of Luis*, 134 N.E.3d 1070 (Ind. Ct. App. 2019) (*Luis II*); *In re Guardianship of Xitumul*, 137 N.E.3d 945 (Ind. Ct. App. 2019); *A.J.L.B. by Lemus v. Alvarenga*, 224 N.E.3d 345 (Ind. Ct. App. 2023). Two of these decisions—*Luis I* and *Luis II*—involve the same judge as this case.

[17] As these and other decisions have explained, the SIJ classification protects abused, neglected, and abandoned immigrant youth through a process allowing them to become lawful permanent residents despite their unauthorized entry into or unlawful presence in the United States. *Xitumul*, 137 N.E.3d at 951. "Although the final decision regarding whether a child qualifies for SIJ status is made by the federal government, the process for obtaining SIJ status requires the collaboration of state and federal systems." *A.J.L.B.*, 224 N.E.3d at 350 (quotation omitted); *see also Hernandez v. Dorantes*, 994 N.W.2d 46, 57 (Neb. 2023) ("[SIJ status] is a unique form of immigration relief in that the application process requires determinations made by both the state courts and the federal government." (footnote omitted)). "Generally speaking, the application for SIJ status involves a two-step process." *Hernandez*, 994 N.W.2d at 57.

[18] For the first step, the state juvenile court—as the appropriate forum for child-welfare determinations about abuse, neglect, and abandonment and a child's best interests—is charged with making the factual inquiry relevant to SIJ status and entering an order regarding its findings. *A.J.L.B.*, 224 N.E.3d at 350. "The state court's role in the SIJ process is not to determine worthy candidates for citizenship, but simply to identify abused, neglected, or abandoned alien children under its jurisdiction who cannot reunify with a parent or be safely returned in their best interests to their home country." *Id.* (quotation omitted). As noted above, a state juvenile court must make three findings:

> (1) The juvenile has been declared dependent on a juvenile court located in the United States or placed in the custody of a State

agency or individual by a juvenile court located in the United States;

(2) "[R]eunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law"; and

(3) It is not "in the alien's best interest to be returned to the alien's . . . previous country of nationality or country of last habitual residence[.]"

8 U.S.C. § 1101(a)(27)(J)(i), (ii); 8 C.F.R. § 204.11(c); *see also* 6 U.S. Citizenship & Immigration Servs. Policy Manual, Part J, Chapter 2, https://www.uscis.gov/policy-manual/volume-6-part-j-chapter-2; *Xitumul*, 137 N.E.3d at 953-54 (explaining that a state juvenile court must make findings about "1) dependency or custody, 2) parental reunification, and 3) best interests" (emphasis removed)).

[19]    After the state juvenile court issues a predicate order with the required findings, the second step for the child is to apply for SIJ status with the federal agency USCIS using Form I-360. *Luis I*, 114 N.E.3d at 858; *A.J.L.B.*, 224 N.E.3d at 350. "Relief is not guaranteed and denial of the application renders [the child] subject to deportation as an undocumented immigrant." *A.J.L.B.*, 224 N.E.3d at 350 (quotations omitted).

[20] Martin argues the trial court should have found that reunification with Father is not viable due to abandonment under Indiana law.[1] Title 31 of the Indiana Code, which covers family and juvenile law, has a couple of definitions of "abandoned." Indiana Code section 31-21-2-2 defines "abandoned" as "left without provision for reasonable and necessary care or supervision." Indiana Code section 31-19-9-8(b) provides, "If a parent has made only token efforts to support or to communicate with the child the court may declare the child abandoned by the parent." At the hearing, evidence was presented that Father never acknowledged or accepted Martin as his child, as Father had a different family. Father did not provide Martin with reasonable care in terms of adequate food, education, or supervision. Before his death, Father had not visited Martin for several years and had only seen him at a market. Despite this undisputed evidence, the trial court found that Martin had not been "abandoned" because when he left Guatemala for the United States in 2022 Father had been dead for a year.

---

[1] Martin claims that reunification with Father, not Mother, is not viable due to abandonment. This is all that is needed. 8 U.S.C. § 1101(a)(27)(J)(i) requires that "reunification with **1 or both** of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law." (Emphasis added). "[T]he majority of states" that have addressed this emphasized language have concluded that the use of the disjunctive "or" "signals the reunification prong is met where the juvenile cannot reunify with one parent or with both parents." *Amaya v. Guerrero Rivera*, 444 P.3d 450, 453 (Nev. 2019).

Martin also argues that reunification with Father is not viable due to abuse and neglect, but because we find abandonment, we do not address abuse or neglect.

But Father had abandoned Martin long before then. That Father died in 2021 did not change that. As another state's appellate court has explained in a similar case:

> [The trial court] held petitioner's inability to reunify with his mother was "due to" death, not abandonment. It would be a particularly parsimonious reading of the statute, however, to deny relief to a petitioner who had been fully abandoned just because his or her parents, by dint of circumstance, died after the abandonment. . . . The facts here amply demonstrate that petitioner's mother permanently abandoned him. That she died only cemented the permanent abandonment already in place. As recounted above, the purpose of the SIJ statute is to provide relief from abuse, neglect, or abandonment. The deleterious effects of abandonment are not allayed by the parent's death. Accordingly, we hold that where a parent, having abandoned a child, dies in that state of abandonment, the child's inability to reunify with that parent is still "due to" abandonment for purposes of the SIJ statute.

*Eddie E. v. Superior Court*, 183 Cal. Rptr. 3d 773, 783 (Cal. Ct. App. 2015); *see also In re Guardianship of Jose YY.*, 69 N.Y.S.3d 733, 735 (N.Y. App. Div. 2018) (holding that "reunification of the child with his parents is impossible since both parents are deceased, which, under state law, leaves the child abandoned or in the alternative, makes him a destitute child, a state basis similar to abandonment").[2] We agree and likewise hold that when a parent, having

---

[2] We note that several state legislatures have enacted statutes to help trial courts with the SIJ process. As particularly relevant here, Colorado Revised Statute 15-14-204 (2024) provides that "'abandonment' includes, but is not limited to, the death of one or both parents." *See also* Mass. Gen. Laws ch. 119, § 39M (2024)

abandoned a child, dies in that state of abandonment, the child's inability to reunify with that parent is still due to abandonment for purposes of the SIJ statute.[3]

[22] Applying that holding here, it is undisputed that Father abandoned Martin at birth and that Martin was still abandoned when Father died in 2021. Accordingly, Martin's inability to reunify with Father is due to Father's abandonment. The trial court erred by not finding that reunification with Father is not viable due to abandonment.

[23] The question then becomes what should we do? Normally, we would remand the case to the trial court with instructions to make the appropriate findings. *See Luis II*, 134 N.E.3d at 1076. But this is not a normal case. As Martin points out in his brief, the judge extensively questioned Martin about his manner of travel to the United States and signaled that he is unwilling to make the required SIJ findings whenever the evidence shows that a child has paid money to cross the border. But whether a child has paid money to cross the border has no discernible connection to whether reunification with one or both of their parents is not viable due to abuse, neglect, abandonment, or similar basis under Indiana law. As many courts have recognized, "The task of weeding out bad faith applications falls to USCIS, which engages in a much broader inquiry than

---

(providing that "the death of a parent" is a similar basis under Massachusetts law). Our legislature has not enacted any SIJ-related statutes.

[3] This appeal does not require us to address whether death alone could constitute abandonment for purposes of the SIJ statute.

state courts." *Eddie E.*, 183 Cal. Rptr. 3d at 780; *see also Guardianship of Penate*, 76 N.E.3d 960, 966 (Mass. 2017) ("The immigrant child's motivation for seeking the special findings, if relevant to the child's entitlement to SIJ status, ultimately will be considered by USCIS in its review of the application. The immigrant child's motivation is irrelevant to the judge's special findings.").

[24] Moreover, in *Luis I* and *Luis II*, this same judge showed his unwillingness to make the required findings even though the evidence supported them. In *Luis I*, the judge said he had a "real problem" that the "federal government" had gotten him involved in making findings in immigration cases. 114 N.E.3d at 857. Although the judge found that the child was abandoned and neglected, it did not make the required findings about parental reunification and best interests. The child appealed, and we remanded the case "with instructions to consider the request for SIJ findings in light of the evidence presented[.]" *Id.* at 859. On remand, however, the judge "failed to make a finding as to whether reunification between [the child] and her parents is viable and refused to make a finding regarding whether it is in [the child's] best interests to remain in the United States." *Luis II*, 134 N.E.3d at 1075. The child appealed again. In *Luis II*, we concluded that the judge's own findings established that reunification between the child and her mother was not viable and that the evidence showed that it would not be in the child's best interests to return to Guatemala. We explained that while we normally would remand to the trial court to make the appropriate findings, that wasn't appropriate in this case:

> Normally, we would remand to the trial court to make the appropriate findings. But we have already done that once and the trial court refused to comply with our instructions on remand. There is a clock that is ticking for [the child] . . . . Given that the trial court took an inordinate amount of time to issue its order following the first appeal and that it refused to make the required findings a second time, we will exercise our authority pursuant to Indiana Appellate Rule 66(C)(10) allowing us to grant any appropriate relief.

*Id.* at 1076. Accordingly, we ordered the trial court to enter an order containing four specified findings and to enter the findings "verbatim" "within one business day of the certification of this appeal." *Id.*

[25] Given the judge's comments in this case, his actions in *Luis I* and *Luis II*, and Martin's request that we remand this case to the trial court "with specific instructions and language for the required findings," Appellant's Br. p. 11, we follow the lead of the *Luis II* Court and order the trial court to do the following on remand:

> 1. Make edits to current findings 1 and 4 to reflect Martin's current circumstances, such as his age and grade in school.

> 2. Remove current findings 9, 11, 13, 14, 16, and 17 and the last paragraph (discussed above) that begins, "This Court is aware that the findings this Court makes will be used in a subsequent immigration hearing."

> 3. Keep all other findings.

> 4. Make these additional findings:

a. The evidence shows that the child's biological father has abandoned him since birth. The biological father did not recognize or accept the child as his own and did not support him, financially or emotionally.

b. That the child's biological father died in 2021 only cemented the abandonment that was in place.

c. The child's reunification with his biological father is not viable due to abandonment.

As in *Luis II*, the judge must make the above edits to the order within one business day of the certification of this opinion.

[26] Reversed and remanded.

Weissmann, J., and Foley, J., concur.

ATTORNEY FOR APPELLANT

Carey J. Haley
Indianapolis, Indiana